UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LATISH MALLOY,

    *Plaintiff*,

v.

DISTRICT OF COLUMBIA,

    *Defendant.*

No. 20-cv-03219 (DLF)

## MEMORANDUM OPINION

Plaintiff Latish Malloy brings this case under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*, challenging the District of Columbia Public Schools' (DCPS or District) failure (1) to provide her son's complete educational records, (2) to identify her son as a student with disabilities, and (3) to award him compensatory education. Before the Court are the plaintiff's Motion for Summary Judgment, Dkt. 26, and the District's Cross-Motion for Summary Judgment, Dkt. 29. For the reasons below, the Court will grant the plaintiff's motion in part, deny the District's motion, vacate the hearing officer's August 10, 2020, opinion, and remand this case for the hearing examiner to determine in the first instance when C.E. was first deprived of a free appropriate public education (FAPE) and whether compensatory education is warranted.

### I. BACKGROUND

#### A. Statutory Framework

Under the IDEA, "every child with a disability in this country is entitled to a 'free appropriate public education,' or FAPE." *Leggett v. District of Columbia*, 793 F.3d 59, 62 (D.C. Cir. 2015) (quoting 20 U.S.C. § 1400(d)(1)(A)). To implement this statutory requirement,

school officials must "develop a comprehensive strategy, known as an 'individualized education program,' or IEP, tailored to the student's unique needs." *Id.* at 63 (quoting 20 U.S.C. § 1414(d)(1)(A)). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). To that end, the statute creates "an affirmative obligation"—the "Child Find" obligation—that "every public school system . . . identify students who might be disabled and evaluate those students to determine whether they are indeed eligible" for an IEP. *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 16 (D.D.C. 2008); *see also* 20 U.S.C. § 1412(a)(3)(A) (creating this obligation). This "obligation extends to all children who are *suspected* of having a qualifying disability." *R.P. ex rel. Horne v. Potomac Preparatory P.C.S*, 209 F. Supp. 3d 146, 157–58 (D.D.C. 2016) (emphasis in original) (citing 34 C.F.R. § 300.111(c)(1)).

The IDEA also provides parents with certain procedural safeguards. First, the statute requires local educational agencies to "establish and maintain procedures in accordance with" the statute "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." 20 U.S.C. § 1415(a). Second, and most relevant here, the IDEA requires local educational agencies to provide "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child." *Id.* § 1415(b)(1).

Parents who are dissatisfied with the agency's "'identification, evaluation[,] or educational placement' of their child . . . may request a due-process hearing." *Davis v. District of Columbia*, 244 F. Supp. 3d 27, 38 (D.D.C. 2017) (quoting 20 U.S.C. § 1415(b)(6)). At this hearing, parents are entitled to have their counsel accompany and advise them, present evidence, cross-examine witnesses, and receive a written decision from the hearing officer. 20 U.S.C. § 1415(h). Finally, parents can bring a civil action in state or federal court for review of the hearing officer's decision. *Id.* § 1415(i)(2).

**B.     Factual Background**

C.E. is Malloy's seventeen-year-old son and a student at Roosevelt High School in the DCPS. A.R. 6, 15. C.E. has a history of struggling academically. During the 2016–17 school year, when C.E. was in eighth grade, he scored one out of five on state ELA and math assessments.[1] A.R. 277. He scored the same the following year on those two assessments, as well as the state algebra assessment. *Id.* In the 2018–19 academic year, he failed six out of eight classes and continued to receive low marks on state assessments. A.R. 261–63, 277.

As early as fall 2017, when C.E. was a freshman in high school, teachers noted concerns about his performance in school. A.R. 300. In October of that year, three different teachers (April Williamson, Sindy Carbal, and Ashley Simmons) reached out to Malloy about C.E.'s poor academic performance, his lack of improvement, and his disinterest in class. A.R. 299–300. In November, Simmons noted that C.E. "lack[ed] focus and ability to complete work successfully" and that "[h]e [wa]s often easily distracted." A.R. 299. This pattern continued in January, with teacher Ashley Beck noting C.E.'s "failing grade and poor behavior." *Id.* For the remainder of

---

[1] It is unclear from the record whether C.E. had an IEP in middle school. *But see* A.R. 19 (alleging that C.E. had an IEP in eighth grade in the due process complaint notice).

the spring semester, teachers noted C.E.'s trouble finishing assignments and failing status. A.R. 298. Nonetheless, somehow C.E. completed his freshman year with passing grades—5 Cs, 2 Bs and 3 Ds—except for one class which he failed. A.R. 6. Despite C.E.'s troubling academic record during eighth grade and his unexcused absences and academic struggles during his freshman year, the school's Director of Specialized Instruction, Devon Wade, testified at C.E.'s due process hearing that, other than minor attendance issues that year, "there was nothing that . . . indicate[d] for [him] that he needed to be tested." A.R. 648; *see* A.R. 647–48.

During C.E.'s sophomore year—the 2018–19 school year—C.E.'s performance and attendance became much worse. He failed seven of his nine classes and had an extraordinary number of unexcused absences, including 64 in English, 65 in French, 46 in Test Taking Strategy, and 43 in World History. A.R. 6–7. Multiple teachers noted issues with C.E.'s attendance and incomplete assignments. A.R. 293–98. But they also expressed concerns with C.E.'s learning and behavioral struggles. For example, in October, one teacher noted that he had trouble retaining content. A.R. 298. And in February and March, a different teacher noted C.E.'s behavioral problems, such as refusing to do work, getting up and walking around during class, and banging on the classroom door while cursing after showing up late to class. A.R. 297. By April, C.E.'s attendance problems had escalated to a court referral. A.R. 296. In May, two teachers noted that he had a failing grade in their classes. A.R. 296. C.E. continued to refuse to do work and did not follow classroom instruction. A.R. 294–95. His attendance problems continued during summer school. A.R. 293. A test of his reading abilities placed him a full five grade levels below his current grade. A.R. 7.

In C.E.'s junior year—the 2019–20 school year—his attendance and academic problems continued. Three different teachers noted attendance problems and either spoke with Malloy or

left her a message in September. A.R. 293. Teachers continued to note attendance problems for the remainder of the semester, which generated attendance warnings and another court referral. A.R. 291–92. C.E. continued to receive attendance warnings in the spring. A.R. 291. Two teachers called Malloy about these problems and one left a message that explained that the teacher had never met C.E. due to his lack of attendance. A.R. 290. C.E. failed every class that year and was absent for a total of ninety-nine days. A.R. 7.

Despite C.E.'s increasingly poor academic performance, his teachers' comments about his learning and behavioral struggles, and his abysmal attendance record from 2017–20, neither Roosevelt nor DCPS identified him as a student with even a "suspected" disability worthy of exploration, 34 C.F.R. § 300.111(c)(1) ("Child find also must include children who are suspected of being a child with a disability . . . ."). His own mother, Malloy, was the first to advocate for an IEP on his behalf. *See* A.R. 5. Her efforts were futile until she obtained the results of an independent comprehensive psychological examination in July 2020. *See* Pl.'s Statement of Material Facts ¶¶ 9–15, 18, Dkt. 26-1.[2] Not surprisingly, those evaluations reveal that C.E. has multiple disabilities. He has severe, specific learning disorders in reading, math, and written expression, as well as a language disorder, which place him five to seven years behind in *all* academic areas, *id.* ¶¶ 13–14. C.E. also has an unspecified depressive disorder. *Id.* ¶ 13.

**C.   Procedural History**

On March 20, 2020, Malloy requested a copy of all of C.E.'s educational records, A.R. 41–42, and the school provided some, but not all, of his records. A.R. 44–48. In particular, the school did not provide all of C.E.'s student support plans or discipline records. A.R. 44–45. On

---

[2] The Court cites to the plaintiff's statement of material facts when the defendant has indicated that the fact is undisputed.

April 14, counsel for DCPS advised Malloy that "providing [student disciplinary] records to attorneys [wa]s not a priority at this time." A.R. 69. On April 23, 2020, Malloy filed a due process complaint based on DCPS's "[f]ailure to identify, locate and evaluate a student with a suspected disability" and its "[f]ailure to provide access to complete educational records." A.R. 18. In conjunction with that complaint, she also filed a motion to compel DCPS to produce the records not yet provided or, in the alternative, assume the unprovided student support plans were identical to the ones provided. A.R. 37–38. On June 23, 2020, the hearing officer denied Malloy's motion on the grounds that "circumstances beyond [DCPS's] control prevented further access" to the records and thus the relevant facts were disputed. A.R. 113–14.

The officer held the due process hearing on July 23, 2020, via closed videoconference. A.R. 5. He concluded that DCPS had not failed to meet its obligation under the IDEA to find a student with a suspected disability. A.R. 8–10. Specifically, the officer concluded that C.E.'s attendance problems alone were insufficient to trigger the school district's child find obligations. A.R. 9–10. He noted that, although C.E. had poor grades, he had passing grades during his freshman year and only began failing after he became chronically truant. A.R. 11. He found that C.E.'s poor standardized test scores were insufficient to put the administration on notice that further evaluation was necessary because they were coupled with passing grades during his freshman year. *Id.* But the officer made no mention of the repeated concerns that C.E.'s teachers had raised about his academic performance. *See* A.R. 291–300. And even though he acknowledged C.E.'s extremely poor grades, *see* A.R. 6–7, 9, and his alarming number of unexcused absences, *see* A.R. 6–7, 9–10, the hearing officer nonetheless concluded that the school district had not defaulted on its affirmative obligation to evaluate C.E. for a learning or

6

behavioral disability, *see* A.R. 11.[3] He further found that the school district was under no obligation to provide Malloy with all of C.E.'s student support plans because DCPS provided all the records to which it had access and those records "were developed to address [C.E.'s] truancy, and were not relevant [to] the issue of [C.E.'s] academic performance or behavior." A.R. 13.

On November 8, 2020, Malloy filed her complaint in this case. Dkt. 1. She alleges that DCPS failed to meet its affirmative obligation under the IDEA to find C.E. as a child with a suspected disability. *See* Compl. ¶¶ 9–23. She also alleges that the school district failed to provide access to all educational records as required under the IDEA. *See* Compl. ¶¶ 24–33. She seeks (1) a declaration that DCPS failed to identify C.E. as a suspected disabled child, (2) an order compelling access to his complete educational record, and (3) either the funding of compensatory education or an evaluation to serve as the basis for an award in an administrative hearing for a compensatory education. *See id.* at 5–6. The parties have filed cross-motions for summary judgment, *see* Dkts. 26, 29, which are now ripe for resolution.

## II.   LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And a dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. "If there

---

[3] For this reason, the hearing officer did not allow Malloy to introduce any of the independent expert evaluations that concluded that C.E. has a number of severe learning and behavioral disabilities. *See* A.R. 11.

7

are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Holcomb*, 433 F.3d at 895 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In an IDEA suit, however, "judicial review of an administrative agency's decision by way of a summary judgment motion . . . is not a true summary judgment procedure." *Lopez-Young v. District of Columbia*, 211 F. Supp. 3d 42, 50 (D.D.C. 2016) (internal quotation marks and citation omitted). "Instead, the district court essentially conduct[s] a bench trial based on a stipulated record." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (alteration in original) (citation omitted); *see also Smith v. District of Columbia*, 846 F. Supp. 2d 197, 200 (D.D.C. 2012) (explaining that court review in IDEA context is like "review of an administrative decision"). When "no additional evidence is introduced in a civil suit seeking review" of a hearing officer's determination, "a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record." *Brown v. District of Columbia,* 568 F. Supp. 2d 44, 50 (D.D.C. 2008). "The party challenging the administrative determination takes on the burden of persuading the court that the hearing officer was wrong." *Middleton v. District of Columbia,* 312 F. Supp. 3d 113, 129 (D.D.C.2018) (quoting *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C. Cir. 1988)) (internal quotation marks and alteration omitted).

Nonetheless, "[j]udicial review under IDEA is more rigorous than in typical agency cases." *N.G.* 556 F. Supp. 2d at 18 (citing *Reid ex rel. Reid v. District of Columbia,* 401 F.3d 516, 521 (D.C. Cir. 2005)). The "court must give due weight to the" hearing officer's determination "and may not substitute its own notions of sound educational policy for those of the school authorities." *Turner v. District of Columbia,* 952 F. Supp. 2d 31, 35–36 (D.D.C.

8

2013) (quoting *S.S. v. Howard Rd. Acad.,* 585 F. Supp. 2d 56, 63 (D.D.C. 2008)) (internal quotation marks omitted). But "a hearing decision without reasoned and specific findings deserves little deference,'" *Reid,* 401 F.3d at 521 (quoting *Kerkam v. Superintendent, D.C. Pub. Sch.,* 931 F.2d 84, 87 (D.C. Cir. 1991)) (internal quotation marks omitted), and in such a case, a "district court may determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings," *id.* at 526. A district court must base "its decision on the preponderance of the evidence." 20 U.S.C. § l415(i)(2)(C)(iii).

### III.  ANALYSIS

Under the IDEA and its implementing regulations, the local educational agency (in this case, the school district) "must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency." 34 C.F.R. § 300.613(a); *see also* 20 U.S.C. § 1415(b)(1). When a parent requests such records, "[the school district] must comply . . . without unnecessary delay and before . . . any [due process] hearing," 34 C.F.R. § 300.613(a), and a failure to do so "is a procedural violation of the IDEA," *Simms v. District of Columbia*, No. 17-cv-970, 2018 WL 4761625, at *21 (D.D.C. July 28, 2018). A procedural violation creates a viable claim under the IDEA "only if [it] affect[s] the student's *substantive* rights." *B.F. ex rel. Lesesne v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006).

Even though Malloy, C.E.'s mother, had an unequivocal right to her son's educational records, *see* 34 C.F.R. § 300.613(a); 20 U.S.C. § 1415(b)(1), the hearing officer erroneously concluded that DCPS was not required to provide Malloy access to C.E.'s records for the due process hearing. *See* A.R. 114 (stating that "circumstances beyond [the school's] control"—the Covid-19 pandemic—"prevented further access"). The examiner based his conclusion on faulty

9

factual and legal premises. First, as a factual matter, the examiner found that DCPS was unable to provide the records during the pandemic even though the record shows otherwise. Although it is true that "[t]he school [wa]s technically closed" during the relevant time frame, due to the pandemic, A.R. 72, the school's Director of Specialized Instruction, Devon Wade, admitted to Malloy's counsel that the school was "open as a meal site" and "for the purposes of distributing technology," *id.* Nonetheless, neither Wade nor the school's attorney, Maya Washington, were willing to provide copies of C.E.'s records to Malloy's counsel, despite his offers to pick the records up at a date and time convenient to the school officials. *See* A.R. at 69–72. As Washington herself explained to Malloy's counsel, "providing SBT records to attorneys [wa]s *not a priority at th*[*at*] *time*." A.R. 69 (emphasis added). Given that the record reflects that school officials did in fact have access to C.E.'s records, the hearing examiner's factual finding that C.E.'s support plans were "inaccessible" to DCPS during the pandemic, A.R. 8, is clearly erroneous. In addition, the hearing officer provided no legal authority to support his extratextual pandemic "exception" to the IDEA's access to student records requirements. *See* A.R. 8, 13, 114. For these reasons, the Court disagrees with the hearing examiner and finds that DCPS violated the Malloy's procedural rights under the IDEA.[4]

Not all procedural violations are actionable under the IDEA, only those that "affected the student's *substantive* rights." *Lesesne*, 447 F.3d at 834 (emphasis in original). When, as here, a parent alleges that a school district has failed to meet its child find obligation, the district's failure to provide the parent with access to her child's educational records affects the student's

---

[4] The hearing officer's decision also appears to conflate the standard for a motion to compel with the standard for a motion for summary judgment. *See* A.R. 114. And he further erred by concluding that factual issues remained in dispute with regard to C.E.'s records because both parties agree that DCPS failed to provide Malloy with *some* of C.E.'s records. *See* Pl.'s Mem. at 9; Def.'s Opp'n at 10–11.

substantive rights if it significantly hampers the parent's ability to participate in the IDEA process. *See id.* DCPS's failure to provide Malloy with all of C.E.'s support plans impeded Malloy's ability to advocate fully for C.E. during the due process hearing.

On this point, however, the hearing officer reached the opposite conclusion. He found that Malloy was not prejudiced by DCPS's unwillingness to produce all of C.E.'s educational records because, in his view, the support plans "were developed to address [C.E.'s] truancy, and were not relevant [to] the issue of his[] academic performance or behavior." A.R. 13; *see also* A.R. 655–56 (Wade's testimony that the unprovided support records said "nothing about academics" and did not indicate whether "the student needs to be identified for special education, or testing"). But this Court has repeatedly recognized that there can be a link between truancy and learning or behavioral disabilities. *See, e.g.*, *Middleton*, 312 F. Supp. 3d at 145–47 (D.D.C. 2018) (recognizing that truancy can be related to disability and concluding that the school "denied [the student] a FAPE by failing to properly address his attendance issues," *id.* at 145); *see also Wade v. District of Columbia*, 322 F. Supp. 3d 123, 135–36 (D.D.C. 2018) (recognizing link between attendance issues and appropriateness of IEP placement).[5] And even though *Middleton* and *Wade* "involved implementation of IEPs of students already found to be disabled," A.R. 9–10, rather than a failure to comply with the child find obligation, A.R. 9, it does not follow that truancy is *irrelevant* to a child find claim. And without access to C.E.'s educational records to which she was statutorily entitled, Malloy was unable to fully press that

---

[5] Other courts have, too. As one judge aptly noted: "The easy explanation for T.B.'s educational demise is that he did not attend school regularly, and when he did, he did not put forth his best effort. The unfortunate reality of this case, however, is that the evidence presented at the due process hearing fails to answer the obvious question: 'Why?' In the special education context, the answer is rarely that a student 'simply does not want to go to school.'" *T.B., Jr., ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 581 (4th Cir. 2018) (Gregory, C.J., concurring in the judgment) (citation omitted).

11

argument. Thus, her "opportunity to participate in the decisionmaking process" was "significantly impeded" such that the District violated the IDEA. 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

Despite this legal authority and substantial evidence to the contrary, the hearing officer erroneously concluded that truancy was the *only* indicium of disability in C.E.'s case. *See* A.R. 10 (noting that Malloy "ha[d] cited no authority for the proposition that truancy alone warrant[ed] the initiation of child find procedures"). Yet C.E.'s consistently low grades, poor test scores, and teachers' concerns, along with his abysmal attendance record, *see supra* section I.B., more than put DCPS on notice some time before April 23, 2020, when C.E. was identified as disabled, that he might have a learning or behavioral disability.

Indeed, Wade herself testified that "[C.E.'s] attendance was a *huge red flag* for me. I noticed that prior to the pandemic he had already accumulated 107, about yeah, about 107 absences, that's a huge red flag for me. . . ." A.R. 644 (emphasis added). C.E.'s teachers, social workers, and counselors shared Wade's concern. *Id*. When pressed during the hearing whether there was *any other information*, aside from attendance issues, that might make Wade think C.E. should be evaluated, Wade doubled down, stating "No, no, not, not, no not really because only thing is because of his attendance. When I looked at his ninth grade year, he had passing grades except for that one class he wasn't final which was an elective. So, there was *nothing* that would indicate for me that he needed to be tested." A.R. 647–48 (emphasis added).

Wade's testimony is belied by the record. Throughout 2017–20, multiple teachers expressed concerns about C.E.'s performance on numerous occasions. They said that he was performing poorly academically and not improving over time, *see* A.R. 291–300; he was disinterested in class, *see* A.R. 299–300; he "lack[ed] focus and ability to complete work

12

successfully" and "[wa]s often easily distracted," A.R. 299; he showed "poor behavior," *id.*; he had trouble finishing assignments and retaining content, *see* A.R. 298; he showed behavioral problems, such as a refusing to do work, getting up and walking around during class, and banging on the classroom door while cursing after showing up late to class, *see* A.R. 297. C.E. also scored one out of five on state ELA and math assessments during the 2016–17 school year, when he was in eighth grade, and he scored the same the following year on those two assessments, as well as the state algebra assessment. A.R. 277. And in the 2018–19 academic year, C.E. continued to receive low marks on state assessments. *Id.*

Even though C.E. passed some of his classes during the 2017–18 school year, his test scores, subsequent failing grades, and teacher comments, together, reflect a consistent pattern of academic struggles suggestive of a learning disability. Likewise, his countless unexcused absences and various instances of misconduct in the classroom raised a suspicion of a learning or behavioral disability. Though the long list of red flags may not have led to interventions and classroom accommodations under the IDEA, at a minimum they provided a more than adequate basis for an evaluation, consistent with the school district's child find obligation. *See, e.g.*, *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271–72 (3d Cir. 2012) (explaining that the IDEA's child find obligation requires the evaluation of a child "within a reasonable time after school officials are on notice of behavior that is *likely* to indicate a disability," *id.* at 271 (emphasis added)). Because Wade's testimony that C.E.'s attendance issues alone were the *sole* cause of his poor academic performance and behavioral problems is not supported by the record as a whole, the Court disagrees with the hearing officer and concludes that Malloy met her burden in "show[ing] that school officials overlooked clear signs of disability and were negligent in failing to order testing." *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (establishing

this as the standard for evaluating child find claims). Thus, DCPS failed to meet its obligation in locating, evaluating, and identifying C.E. as a child with a disability on or before April 23, 2020.[6]

In reaching this conclusion, the Court does not rely on the 2020 findings of the independent experts who evaluated C.E.[7] Even so, these evaluations provide helpful context, illustrating the enormous struggles C.E. faced in the classroom. Based on several evaluations, these experts determined that C.E. has severe and specific learning disorders in reading, math, and written expression; that he has a language disorder and an unspecified depressive disorder; that he is five to seven years behind in all academic areas; that he has severe deficits (all falling in the second percentile or less) in a host of language abilities; and severe deficits with visual-motor and fine-motor integration, among others (again, all falling in the first percentile or less). *See* Pl.'s Statement of Material Facts ¶¶ 9–15. Without the support of any interventions or accommodations, it is unsurprising that C.E.'s behavioral problems increased over time and that eventually, he chose to avoid the classroom altogether.

---

[6] Similarly, the hearing examiner's conclusion that there was *no evidence* that Malloy harbored any concerns that C.E. had a disability before March 2020, when she requested C.E.'s records, simply because she elected not to testify at the due process hearing is undermined by the record. A.R. 11, 41–42. As noted, numerous teachers made clear to Malloy through their comments, grades, and testing results that C.E. was struggling to meet the academic and behavioral demands at school. *See supra* section I.B. Furthermore, the hearing examiner legally erred by focusing on whether Malloy "harbored concerns that [C.E.] had a disability prior to March 2020," A.R. 11, because the child find obligation is on the District, not the parent, *see Reid*, 401 F.3d at 518 ("School districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction"). *See also Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 677 (5th Cir. 2018) (explaining that "the IDEA imposes the Child Find obligation upon school districts, not the parents of disabled students").

[7] Because the parties have not fully briefed the issue, the Court takes no position here as to whether the hearing officer erred by excluding the independent expert evaluations from evidence during the due process hearing. *See* A.R. 11; Pl.'s Mem. at 13–14; Def.'s Opp'n at 13.

Although the standard of review in this case is not *de novo* and "the burden of proof is . . . on the party challenging the administrative determination," *Thomas v. District of Columbia*, 407 F. Supp. 2d 102, 108 (D.D.C. 2005), the D.C. Circuit has explained that "a hearing decision 'without reasoned and specific findings deserves little deference,'" *Reid*, 401 F.3d at 521 (quoting *Kerkam*, 931 F.2d at 87).  Upon review of the record, the Court concludes that the hearing decision's factual findings are clearly erroneous.  To recap, the hearing officer was incorrect that DCPS was unable to access C.E.'s records, *see* A.R. 8, 13, 114; that Malloy argued that truancy alone warranted a child find investigation, *see* A.R. 10; and that there was no evidence of any behavioral (or learning) issues other than truancy, *see* A.R. 11.  Additionally, the hearing officer's legal analysis was poorly reasoned.  He conflated the standard on a motion to compel with that for summary judgment, *see* A.R. 114; failed to recognize the connection between truancy and disability, *see* A.R. 9–10; implied that it was the duty of the parent to raise concerns about any suspected disability, *see* A.R. 11, even though the IDEA imposes the child find obligation on the school, not the parent, *see* 20 U.S.C. § 1412(a)(3); and ignored substantial evidence of a suspected learning or behavioral disability in the form of poor test scores, grades, teacher comments, classroom behavior, and attendance, *see* A.R. 11.  Accordingly, the Court finds it deserving of little, if any, deference.

Because the evidence in the record shows that the District should have suspected that C.E. had a qualifying disability that warranted an evaluation, as mandated by the IDEA, the Court holds that the District violated the statute's child find obligation.  For the reasons stated, the Court will order the school district to provide Malloy with all of C.E.'s records, vacate the hearing officer's decision, and remand the case for the hearing officer to determine promptly and

in the first instance (1) when the school district first failed to meet its child find obligation as to C.E. and (2) whether C.E. is entitled to a compensatory education.

## CONCLUSION

For the above reasons, the plaintiff's Motion for Summary Judgment, Dkt. 26, is granted in part and the District's Cross-Motion for Summary Judgment, Dkt. 29, is denied. The hearing officer's August 10, 2020, decision is vacated, and the case is remanded to the hearing officer for further proceedings consistent with this memorandum opinion. A separate order consistent with this decision accompanies this opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 30, 2022